## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Glass Dimensions, Inc. on behalf of the Glass Dimensions, Inc. Profit Sharing Plan and Trust,** *and all others similarly situated,* | ) ) ) ) |
| | ) **CLASS ACTION COMPLAINT** |
| | ) |
| | ) **CIVIL ACTION NO:** |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| **State Street Bank & Trust Co.,** | ) |
| | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Glass Dimensions, Inc., ("Dimensions" or "Plaintiff"), as fiduciary for the Glass Dimensions, Inc. Profit Sharing Plan and Trust (the "Dimensions Plan" or "Plan"), brings this action on behalf of the Plan, and on behalf of all similarly-situated ERISA plans (the Plan and similarly-situated plans are referred to as the "Plans"), that suffered losses as a result of the breaches of fiduciary duties, described in this Complaint, committed by Defendant State Street Bank & Trust Company (Defendant, "SSBT" or "State Street"). Plaintiff brings this action by and through its undersigned attorneys based upon personal knowledge and information obtained through investigation by their counsel. Plaintiff believes that reasonable opportunity for discovery will uncover further substantial support for the allegations in this Complaint.

## I. OVERVIEW

1.     This Complaint arises from breach of ERISA-mandated fiduciary duties, as well as other ERISA violations, that Defendant committed as investment manager and/or investment

advisor to the Plans. Specifically, in violation of its fiduciary duties and ERISA's prohibited transaction rules, Defendant recklessly engaged in the practice known as "securities lending" for its own benefit, in a manner that involved imprudent and unreasonable risk of loss to the Plans. As a result of Defendant's self-serving securities lending practices, which violated Defendant's ERISA fiduciary responsibilities, the Plans suffered losses and impairments to investment liquidity and investment allocations.

2.      In simple terms, the practice of securities lending involves the temporary "loan" of a stock (or other security) by its long-term owner (often a large institutional investor) to a borrower who needs the stock for short term purposes. The borrower secures the loan with collateral. The collateral is then supposed to be invested in safe, short-term, liquid instruments so that the long-term owner of the stock is able to receive some investment income from the collateral investment. If the collateral is invested in secure investments, such as U.S. government bonds, a retirement plan engaging in securities lending may earn some degree of return for little risk.

3.      In this case, the Plans pooled their retirement funds in "collective trusts" managed by State Street. A collective trust is an investment option established for the collective investment of a group of institutional investors, including retirement plans and pension funds. All of the members in a collective trust share, *pro rata*, in the same gains and losses. The collective trusts at issue in this case (the "Collective Trusts") offered particular investment styles, but all of them engaged in securities lending, and, as a result of Defendant's illegal conduct, the Plans suffered losses and impaired investment discretion and liquidity.

4.     The Dimensions Plan invested in the following Collective Trusts, all of which participated in the securities lending program, offered and managed by Defendant: Active U.S. Small Cap Securities Lending Fund; Passive Bond Market Securities Lending Fund; and Daily International Alpha Securities Lending Fund.

5.     Each of the Collective Trusts is managed by State Street according to an investment policy. Some, if not all, of these funds are measured against an established benchmark. For example, the performance of the Passive Bond Market Securities Lending Fund, in which the Plan invested, is measured against the performance of the Barclays Capital Aggregate Bond Index.

6.     The Collective Trusts loaned securities they held (and the Plans held indirectly) to borrowers who reportedly posted collateral equal to 102-105% of the value of the borrowed securities. Defendant then invested the collateral (the "Collateral") in other instruments through still other collective trusts. (The funds in which State Street invested the Collateral shall be referred to as the "Collateral Pools".)

7.     Defendant collected fees for facilitating the Collective Trusts' securities lending transactions and shared with the Plans in the investment returns of the Collateral. Defendant received 50% or more of the income earned from the Collateral Pools. Defendant also earned additional fees from securities lending transactions. Defendant did not bear any risk of investment loss in the management of the Collateral Pools.

8.     As "Lending Fiduciary" in securities lending arrangements, Defendant is supposed to guard against the risk of default by ensuring that the Collateral is safe and liquid and that such Collateral is invested prudently invested.

9.     Public documents published by Defendant (a prospectus for the ABA Retirement Funds Program dated January 29, 2009 ("Prospectus")), reveal that its various Collateral Pools have lost billions of dollars. As of the end of 2008, the Collateral Pools were valued at 93 cents on the dollar for funds that are supposed to have a net asset value of $1.00 per unit. Thus, the Collateral Pools lost approximately 7% of their value as of that date. Collateral from securities lending operations is supposed to be invested in very low-risk and liquid instruments like U.S. Treasuries. Defendant, however, have invested in high-risk, illiquid instruments, for which there is no current market. The losses in the Collateral Pools are, in turn, borne by the investors, like the Plans, who invest in the Collective Trusts, when the investors attempt to withdraw from the securities lending program.

10.     Before October 7, 2008, any plan could liquidate its investments in Collective Trusts without restriction. On October 7, 2008 State Street notified the Plan and other Plans that it had modified the withdrawal procedures for clients withdrawing their interest in lending funds. State Street explained that such clients would receive a portion of the withdrawal proceeds in cash and a portion in an interest in the underlying collateral pool (such interest will be subject to the same restrictions). The percentage of withdrawal to be received in interests in the underlying collateral pool will vary depending upon the percentage of a lending fund's securities that are out on loan.

11.     The Plan now holds an undetermined percentage of its proceeds in the form a pro rata share of an interest in the Collateral Pool. State Street has unilaterally imposed these improper withdrawal restrictions. This form of distribution causes the Plan to suffer losses because the Plan takes a direct investment in illiquid instruments that are trading below par.

12.     The fees and other compensation Defendant collected in connection with its securities lending activities were unreasonable in light of the risks taken by Defendant with the Plans' assets in Defendant's imprudent management of the Collateral Pools. As one consultant commented, "a perennial problem with securities lending programs" occurs where the money manager gets a percentage of the earned investment gains and therefore has an incentive "to creep out there on the risk scale." Defendant put its own interests ahead of the Plans' interests by taking unnecessary and unreasonable risk in investing the Collateral Pools in order to maximize Defendant's share of the investment returns.

13.     There are three primary risks associated with securities lending:

- **OPERATIONAL RISK** – the risk that the Lending Fiduciary, such as Defendant, did not administer the program as agreed. This includes the fiduciary's failure to mark to market collateralization levels and to post corporate actions and income, including all economic benefits of ownership except for proxy voting.

- **BORROWER/COUNTERPARTY DEFAULT RISK** – the risk that the borrower fails to return the securities due to insolvency or other reasons. Borrower default also leads to trade settlement risk, which is the risk that the lender sells a security on loan and that the loaned security is not returned by the borrower. Therefore the trade fails or the seller is charged with an overdraft fee.

- **COLLATERAL REINVESTMENT RISK** – the risk of investment loss from the reinvestment of the cash collateral by the Lending Fiduciary. The real risk is that the investment of the cash collateral will not earn a sufficient return to cover the agreed upon rebate rate or even to return the collateral at its original value because of interest rate, liquidity and/or credit risks.

14.     Defendant's violations of ERISA arise, *inter alia*, from its imprudence, lack of care, and self-dealing with respect to Collateral reinvestment. Collateral reinvestment risk is shouldered by the lender, here the investors in the Collective Trusts, including the Plans. The lender has to cover both the rebate rate (paid to the borrower) and the full principal value of the cash collateral posted by the borrower. If the rate of return on the invested Collateral is not sufficient to pay the rebate rate coupled with the original value of the collateral (as well as the facilitating fiduciary's fees, here State Street), the lender incurs an investment loss on the transaction. Of course, if the invested Collateral actually loses money, as is the case with the Collateral Pools, the loss is that much larger. The risk of loss can be minimized, and in Defendant's exercise of its fiduciary duties, should have been minimized, by restricting Collateral investment to Collateral Pools that are very high quality and liquid, and then carefully managing potential asset liability duration differences.

15.     State Street breached its duties of prudence, loyalty, and exclusive purpose under ERISA § 404(a) by investing Plan assets recklessly and imprudently, by acting disloyally, by causing losses to the Plans through the Defendant's imprudent and improperly risky actions, and by imposing withdrawal restrictions on investments.

16.     Defendant also violated certain provisions of ERISA that prohibit fiduciaries like Defendant from causing a retirement plan to engage in transactions with related parties and from engaging in self-dealing transactions. By using Plan assets for the benefit of other parties, and by collecting unreasonable fees and other compensation in connection with securities lending and placing its own interests ahead of those of the Plans, Defendant engaged in multiple prohibited

transactions, which are *per se* unlawful in violation of ERISA § 406, and not exempt under any individual, class, or statutory exemption.

17.     ERISA §§ 409(a) and 502(a)(2) authorize ERISA fiduciaries, such as Plaintiff, to sue in a representative capacity for losses suffered by plans as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiff brings this action as a class action under Fed. R. Civ. P. 23 on behalf the Plan and all other similarly-situated Plans, *i.e.,* all Plans that invested Collateral in the Collateral Pools through the Collective Trusts. Plaintiff seeks to restore losses to the Plans, for which State Street is liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).

18.     State Street has sole possession of a great deal of relevant information and documents concerning Plaintiff's allegations. Therefore, following discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add additional facts that further support Plaintiff's claims.

## II. <u>JURISDICTION AND VENUE</u>

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and ERISA §502(e)(1), codified at 29 U.S.C. § 1132(e)(1). The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

20.     Venue is proper in this district pursuant to ERISA §502(e)(2), codified at 29 U.S.C. §1132(e)(2), because SSBT is headquartered in this District and Plaintiff is located in this District.

## III. THE PARTIES

**Plaintiff**

21.    **Glass Dimensions, Inc**. Dimensions is the plan administrator for the Plan and, therefore, a fiduciary for the Plan. It is authorized under ERISA §502(a)(2) to represent the Plan in lawsuits arising under ERISA. Glass Dimensions is located in Essex, Massachusetts. The Plan is a defined contribution plan under ERISA. The Plan invested in the following Collective Trust offered or managed by State Street Defendant: Active U.S. Small Cap Securities Lending Fund; Passive Bond Market Securities Lending Fund; and Daily International Alpha Securities Lending Fund. All of the Collective Trusts participated in Defendant's securities lending programs. State Street has imposed withdrawal restrictions on the Dimensions Plan.

**Defendant**

22.    **State Street Bank & Trust Company ("SSBT")**. SSBT is the trustee of the Plan and is located at 3 Batterymarch Park, Quincy, Massachusetts. As trustee, SSBT is, by definition, a fiduciary to the Plan. Further, SSBT is a fiduciary because its investment arm State Street Global advisors is the investment manager for some or all of the Collective Trusts that State Street offers or manages as well as the Collateral Pools.

## IV. DEFENDANT'S FIDUCIARY STATUS

23.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under §402(a)(1), 29 U.S.C. §1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or

other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i).

24. **Investment Manager**. Under ERISA, an investment manager or investment adviser is a fiduciary. ERISA defines investment manager as:

> (38) any fiduciary (other than a trustee or named fiduciary, as defined in section 1102(a)(2) of this title) –

> (A) who has the power to manage, acquire, or dispose of any asset of a plan;

> (B) who

> (i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b-1 et seq.];

> (ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b-3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

> (iii) is a bank, as defined in that Act; or

> (iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

> (C) has acknowledged in writing that he is a fiduciary with respect to the plan.

ERISA §3(38), 29 U.S.C. §1002(38).

25.     Here, State Street is named and/or serve as the Investment Manager, Trustee, Advisor or administrator of all the Collective Trusts and Collateral Pools and thus is a fiduciary to the Plans. Moreover, State Street Defendant exercise discretion and control over the Plans' assets because State Street manages the Collateral Pools, and thus decides how to invest the Collateral posted by borrowers, and exercises discretion over withdrawal restrictions. In this capacity, State Street Defendant was responsible for prudently and loyally managing the assets that were invested in the Collective Trusts and Collateral Pools for the benefit of the Plans.

## V. <u>SUBSTANTIVE ALLEGATIONS</u>

26.     The Collective Trusts participate in Defendant's securities lending program. Under the securities lending program, securities of the particular Collective Trust are loaned to institutional borrowers, and the lender of such securities (the Collective Trusts and, indirectly, the Plans) receives Collateral in excess of the value of the loaned securities, generally 102% of the value of domestic securities and 105% of the value of foreign securities. Such Collateral may take the form of cash or securities.

27.     All cash Collateral received by the lender from its borrowers is reinvested for the account and risk of the lender (the Collective Trusts, and indirectly the Plans) in one or more Collateral Pools managed by Defendant or its affiliates. The Collateral Pools generally utilize amortized cost pricing of the underlying investments (in an effort to maintain a constant price for units purchased in, or redeemed from, the Collateral Pool) as opposed to marking the underlying investments to market (which would result in a fluctuating value for the units of the cash Collateral Pool). If a Collateral Pool suffers losses or its underlying investments default, there is insufficient liquidity in the Collateral Pool to discharge its obligations to fund cash payments to

the borrowers, the Collateral Pool is required to sell investments prior to their maturity at a loss, and/or the Collateral Pool is required to cease using amortized cost pricing in whole or in part and is forced to reduce the value of its units. Then the affected lenders (the Collective Trusts, and indirectly the Plans) are obligated to utilize their own assets and cash to satisfy any deficiency or losses that may arise with respect to their investment in the Collateral Pools. This causes losses to the affected Collective Trusts, and therefore to the Plans.

28.     The Collective Trusts, and indirectly the Plans, and other lenders bear the entire risk with respect to the investment of cash Collateral. On December 31, 2008, Defendant's Collateral Pools in which the Collective Trusts invest cash Collateral had an average net asset value of approximate $0.93 per unit, in comparison to the amortized cost price of $1.00 per unit at which purchases and redemptions are made in such cash Collateral Pools.

29.     The lender of securities is also obligated to pay a fee to the borrower, the rebate rate, as compensation for the borrower's transfer of cash to the lender. If the Collateral Pool fails to generate sufficient income on its investments to cover the fees due to borrowers, then the affected lenders (the Collective Trusts, and indirectly the Plans) of securities are required to fund any shortfall from their own resources, which would adversely impact the Collective Trusts. Lenders, not Defendant, bear this risk as well.

30.     As investors in the Collective Trusts, the Plans were required to cover the full principal value of the cash Collateral posted by the borrower. If the value of the investments in the Collateral Pools results in a shortfall on the original value of the Collateral, the Plans have suffered an "investment loss." When securities lending is properly administered, the risk of loss is minimized by using very high quality, liquid instruments for collateral investment and then

carefully managing potential asset liability duration differences. Generally, Collateral investments are invested in short term securities to avoid losses and duration risk that may occur in securities or other investments that are meant to be held long term. Defendant purchased investments for the Collateral Pools without prudently evaluating the duration of such investments and said duration's impact on the liquidity of the Collateral Pools and, ultimately, the Collective Trusts, as evidenced by the indefinite withdrawal restrictions that Defendant has imposed for approximately 18 months, as discussed in more detail below.

31.    The Collateral Pool investment policy guidelines said the Collateral Pools would provide safety of principal and daily liquidity.

32.    Defendant's failure to prudently manage the Collateral Pools has caused the Plans substantial harms by failing to use high quality, liquid instruments for Collateral Pools and failing to manage the asset liability duration differences. Thus, as borrowers who posted cash or U.S. Treasuries as Collateral seek the return of that Collateral (plus rebates), the Collateral Pools must make up the shortfall between the return of the invested Collateral and the amount promised to the borrower. Ultimately, investors in the Collective Trusts make up the shortfall, which results in more than normal tracking error diminished performance of Collective Trusts in comparison to their respective benchmarks. Further, when borrowers demand the return of their Collateral but that Collateral has been invested in illiquid, longer-term investments (such as many derivatives and mortgage-backed securities) by Defendant, the Collective Trusts and ultimately their investors, including the Plans, are forced to realize immediate losses rather than holding the investments to duration.

12

33.     In October 2008, State Street notified investors that it was unilaterally limiting withdrawals from securities lending funds to normal course transactions. For investors seeking to liquidate their full investment in a securities lending fund, or to switch from a lending fund to a non-lending fund, State Street informed investors that they would be required to receive a portion of the withdrawal proceeds in cash and a portion in an interest in the underlying collateral pool.

34.     Defendant reported that, purportedly, none of the securities in the Collateral Pools was in default or considered to be impaired at December 31, 2008, and the Collateral Pools had adequate sources of liquidity from normal lending under Defendant's securities lending program as of such date.

35.     On March 23, 2009, State Street informed the Plan and other Plans that it was further restricting investors' withdrawal rights and announced that it was necessary to revise further the withdrawal parameters that had been in place on the Lending Funds since last October. Among other things, State Street limited withdrawal requests from lending funds to a per month maximum of between 2% to 4% of the Plan's net asset value in that Lending Fund at the time of the redemption request.

36.     Thus Plans who cash out have a portion of their investment held back in the form of illiquid instruments from the Collateral Pools which are placed in a "liquidating trust" managed by Defendant. These assets are trading below par and there is very little market for them. The Plans subjected to these withdrawal restrictions, thus, are faced with a Hobson's choice: take illiquid instruments trading well below par or remain captive to Defendant's securities lending program.

37.     Also, in March 2009, State Street amended the trust declarations for the various securities lending investment funds in order to grant itself discretion to restrict withdrawals after the fact. It said it could in its sole discretion adopt and implement redemption practices and policies with respect to the rights of Participants to withdraw or redeem Units from the Fund. Moreover, although State Street communicated on March 23, 2009 that it "sought" to "treat[] all clients fairly" and to "protect the interests of all investors," the amended trust declarations gave State Street sole discretion treat one or more Participants differently from other Participants in determining the extent to which a particular Participant is entitled to withdraw, the per Unit redemption amount to be paid to a particular Participant. State Street, in fact, as explained below, treated some plans differently than others to the detriment of the Plan and in further violation of its duties.

38.     The withdrawal restrictions and commensurate losses are due to Defendant conducting the securities lending program in a negligent and imprudent manner in violation of its ERISA fiduciary duties and took investments risks (in which Defendant did not share) to maximize its own income at the expense of the Plans. Defendant invested the Collateral in Collateral Pools that in turn invested in instruments, including mortgage-backed securities, with unusually high risk and unusually long duration, which caused the Collateral Pools to incur substantial losses in comparison to the original value of the Collateral. This, in turn, rendered the Plans liable to make up the shortfall in returning Collateral to borrowers.

39.     More specifically, Defendant caused the Collateral Pools to invest in instruments with maturity dates of far longer duration than was appropriate for an investment program designed to provide incremental returns while preserving capital and liquidity. The imprudent

duration of many securities purchased by Defendant is evidenced by the fact that Defendant has maintained withdrawal restrictions for much longer than would be necessary if the securities held by the Collateral Pools were of short duration. Defendant first imposed withdrawal restrictions in October 2008. Approximately 18 months have passed since those restrictions were imposed, meaning that any instrument with a maturity date of fewer than 18 months has matured since restrictions were first imposed. That Defendant has not lifted the withdrawal restrictions is strong evidence that much of the remaining investments in the Collateral Pools are in instruments with maturities exceeding 18 months. Such long-duration instruments are not appropriate for an investment program with a core objective of preserving daily investor liquidity.

      40.    Further, Defendant has failed to treat client plans evenhandedly, in further violation of its duties under ERISA. It allows hundreds (if not thousands) of ERISA plans whose assets are held via the ABA Collective Trust to exit the securities lending program without any restrictions or penalties whatsoever. Defendant also permitted the Public School Retirement System of Missouri and the Public Education Employee Retirement System of Missouri (together "PSRS") to collectively withdraw approximately 7 billion dollars in assets from the securities lending program without restrictions or penalties. Yet, Defendant has held the Dimensions Plan and many other similarly-situated plans hostage to Defendant's imprudently-managed securities lending program. Indeed, according to a complaint filed by PSRS, Defendant's officers Scott Patton and Suzanne Lee have conceded that unrestricted withdrawals by PSRS (and presumably any plans in the ABA Trust) have harmed other investors like the Plan here. Such harms include, for example, decreased liquidity in the Collateral Pools, continuation of withdrawal restrictions, and increased penalties to remaining investors who wish to withdraw

from the securities lending program because of the depletion of liquid assets and the increased proportion of long-duration instruments for which remaining investors bear the risk due to Defendant's failure to administer the withdrawal restrictions in a prudent and even-handed manner.

41.     By taking unreasonable compensation in connection with such transactions, taking unreasonable and imprudent risk in the management of Collateral Pools, imposing withdrawal restrictions in violation of its covenants and agreements, and favoring some investors over others with respect to withdrawal restrictions, State Street engaged in numerous prohibited transactions with retirement plan assets for the benefit of themselves.

## VI. <u>THE RELEVANT LAW</u>

42.     ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), provides, in relevant part, that a civil action for breach of fiduciary duty may be brought by the Secretary of Labor, or a participant, beneficiary or fiduciary of a plan for relief under ERISA §409, 29 U.S.C. §1109.

43.     ERISA §409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in relevant part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

44.     ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), authorizes fiduciaries to seek equitable relief from Defendant, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, and other monetary relief.

45.     ERISA §§404(a)(1)(A) and (B), 29 U.S.C. §§1104(a)(1)(A) and (B), provide in relevant part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

46.     These fiduciary duties under ERISA §§404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwith*, 680 F.2d 263, 272 n.2 (2d Cir. 1982). They entail, among other things:

> (a)     The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including, in this case, the investment alternatives of the Collective Investment Funds in which Plan assets were invested;
>
> (b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves, including, in this case, the State Street Defendant's personal interests in receiving some of the cash collateral from securities lending; and
>
> (c)     The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries, including,

17

in this case, with respect to the grave risks of securities lending.

47.     According to DOL regulations and case law interpreting this statutory provision, in order to comply with the prudence requirement under ERISA §404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or course of action involved, including the role that the investment or course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

48.     Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or course of action is reasonably designed, as part of the portfolio, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for return associated with the investment or course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

  ○ The composition of the portfolio with regard to diversification;

  ○ The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

  ○ The projected return of the portfolio relative to the funding objectives of the plan.

49.     As set forth herein, State Street failed in the discharge of these duties, and, generally, in its duty to manage the assets of the Plans prudently, loyally, and in the best interests of the Plans and the Class.

50.    ERISA also prohibits certain transactions with plan involving parties in interest and fiduciaries because of their high potential for abuse. Specifically, ERISA §406 provides as follows:

(a) Transactions between plan and party in interest
Except as provided in section 1108 of this title:
   (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
      (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
      (B) lending of money or other extension of credit between the plan and a party in interest;
      (C) furnishing of goods, services, or facilities between the plan and a party in interest;
      (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
      (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.
   (2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107 (a) of this title.

(b) Transactions between plan and fiduciary
A fiduciary with respect to a plan shall not—
   (1) deal with the assets of the plan in his own interest or for his own account,
   (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
   (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

51.    As set forth herein, State Street violated ERISA §406(a) by causing the Plans to loan their assets to parties in interest, namely the borrowers of loaned securities and State Street itself, for the benefit of the borrowers and Defendant. And State Street Defendant violated ERISA §406(b) by using the Plans' assets to invest in high risk and illiquid instruments through the Collateral Funds to benefit Defendant.

52.     Plaintiff therefore brings this action under the authority of ERISA §502(a)(2) for relief under ERISA §409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by Defendant for violations under ERISA §404(a)(1).

## VII. CLASS ACTION ALLEGATIONS

53.     **Class Definition**. Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plans and the following class of persons similarly situated (the "Class"):

> ERISA Plans that invested directly or indirectly in any Collective Trust that invested Collateral in any Collateral Pool, which Collective Trusts and Collateral Pools were managed and offered by the State Street Defendant, between January 1, 2007 and the present (the "Class Period").

54.     **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that hundreds of ERISA Plans throughout the country invested in the Collective Trusts during the Class Period, and sustained losses as a result of State Street's imprudent securities lending activities. For example, Schedule D to the Form 5500 for the S&P 500 Flagship Fund filed by Defendant for that Collective Trust lists over 100 ERISA plans as investors in the fund. The S&P 500 fund is but one of dozens of Collective Trusts offered to the Plans and managed by Defendant that engaged in securities lending.

55.     **Commonalilty**. The claims of Plaintiff and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by the Defendant. Proceeding as a class action is particularly appropriate here, because Plan assets are held in

Collective Trusts and/or Collateral Pools managed by State Street, where each Plan investor shares in gains and losses on a pro rata basis, and, therefore, Defendant's imprudent actions affected all Plans in the same manner.

56.    Furthermore, common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The many questions of law and fact common to the Class include:

a.    Whether Defendant is a fiduciary under ERISA;

b.    Whether Defendant breached its fiduciary duties under ERISA;

c.    Whether Defendant failed to provide complete and accurate information to Plans and their participants and beneficiaries when Defendant engaged in risky securities lending activities;

d.    Whether Defendant's acts proximately caused losses to the Plans and, if so, the appropriate relief to which Plaintiff, on behalf of the Plans and the Class, is entitled;

e.    Whether Defendant received compensation, direct or indirect, in connection with transactions involving Plan assets, and whether such compensation was reasonable;

f.    Whether Defendant breached its duties in imposing and administering withdrawal restrictions from the securities lending program;

g.    Whether Defendant caused the Plans to engage in prohibited transactions with parties in interest and fiduciaries, including Defendant and its affiliates;

h.      Whether an affirmative defense to prohibited transactions applies and can

be satisfied by Defendant.

57.     **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff seeks relief on behalf of the Plans pursuant to ERISA §502(a)(2), and, thus, Plaintiff's claims on behalf of the Plans are not only typical of, but identical to, a claim under this section brought by any Class member. If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

58.     **Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class. Plaintiff has undertaken to protect vigorously the interests of the absent members of the Class.

59.     **Rule 23(b)(1)(A) &(B) Requirements.** Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

60.     **Rule 23(b)(2) Requirements.** Certification under 23(b)(2) is warranted because Defendant have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

61.     **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII. CLAIMS FOR RELIEF

### COUNT I
### FAILURE PRUDENTLY AND LOYALLY TO MANAGE PLAN ASSETS

62.     Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

63.     Under Section 3(21) of ERISA, 29 U.S.C. §1002(21), State Street was at all relevant times an ERISA fiduciary with respect to the Plans and the invested assets of the Plans.

64.     Under Section 3(38) of ERISA, 29 U.S.C. §1002(38), State Street was at all relevant times an Investment Manager for the Plans.

65.     The scope of the fiduciary duties and responsibilities of State Street included managing the assets of the Plans.

66.     Defendant was obligated to discharge its duties with respect to the Plans' assets with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

67.    Contrary to its duties and obligations under ERISA, Defendant failed to loyally and prudently to manage the assets of the Plans. Specifically, Defendant breached its duties to the Plans and their participants, in violation of ERISA §404(a), by, *inter alia*, (a) exposing Plan assets to excessive levels of risk; and (b) generally failing to invest and manage the assets of the Plans in the manner of a reasonably prudent fiduciary acting under similar circumstances.

68.    Moreover, Defendant failed to conduct an appropriate investigation of the merits of its highly risky and speculative program of securities lending and Collateral investment in light of the particular dangers that this program posed to Plan assets. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of investing Plan assets in highly risky, illiquid, long term investments.

69.    As a consequence of Defendant's breaches of fiduciary duties alleged in this Count, the Plans suffered losses and impairments to liquidity and investment discretion. Had Defendant discharged its fiduciary duties to prudently invest Plan assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans lost hundreds of millions of dollars of retirement savings.

70.    Pursuant to ERISA §§409, 502(a)(2) and (3), 29 U.S.C. §§1109(a), and 1132(a)(2), Defendant are liable to restore the losses to the Plans caused by its breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II
## <u>FOR PROHIBITED TRANSACTIONS INVOLVING PLAN ASSETS</u>

71.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

72.     Under Section 3(21) of ERISA, 29 U.S.C. §1002(21), State Street was at all relevant times an ERISA fiduciary with respect to the Plans and the invested assets of the Plans.

73.     Under Section 3(38) of ERISA, 29 U.S.C. §1002(38), State Street was at all relevant times an Investment Manager for the Plans.

74.     The scope of the fiduciary duties and responsibilities of State Street included managing the assets of the Plans.

75.     State Street, through the Collective Trusts, engaged in numerous prohibited transactions involving the Plans' assets with parties in interest, which transactions were per se prohibited by Section 406(a) of ERISA, 29 U.S.C. §1106(a). Defendant also engaged in numerous self-dealing transactions in violation of Section 406(b) of ERISA, 29 U.S.C. §1106(b), including acting for the benefit of themselves in managing the Collateral Pools and in and receiving compensation, direct or indirect, from transactions involving Plan assets. Such transactions were not exempted by an individual, class, or statutory exemption.

76.     Pursuant to ERISA §§409, 502(a)(2), and (a)(3), 29 U.S.C. §§1109(a), and 1132(a)(2), State Street is liable to restore the losses to the Plans caused by Defendant's violations of Section 406, and to disgorge its compensation and profits thereon, and subject to other equitable relief as appropriate.

## IX. <u>REMEDY FOR BREACHES OF FIDUCIARY DUTIES</u>

77.     Defendant breached its fiduciary duties in that they knew, or should have known, the facts as alleged above, and therefore knew, or should have known, that the securities lending program was imprudent. Defendant also violated ERISA's prohibitions on certain transactions involving plan assets.

78.     ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), authorizes the Secretary of Labor, or a participant, beneficiary or fiduciary of a plan, to bring a civil action for appropriate relief under ERISA §409, 29 U.S.C. §1109. Section 409 requires "any person who is a fiduciary ... who breaches any of the ... duties imposed upon fiduciaries ... to make good such plan any losses to the plan ...." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate...."

79.     With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained their investments in Collective Trusts participating in the challenged securities lending program and, instead, prudent fiduciaries would have invested the Plans' assets prudently and appropriately. In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have occupied had the Plans been properly administered.

80.     Plaintiff, on behalf of the Plans and the Class, is therefore entitled to relief from Defendant in the form of: (a) a monetary payment to the Plans in an amount to be proven at trial based on the principles described above, as provided by ERISA §409(a), 29 U.S.C. §1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, including on order permitting the Plans and the Class to withdraw assets from Collective Trusts, as provided by ERISA §§409(a), 502(a)(2) and (3), 29 U.S.C. §§1109(a), 1132(a)(2); (c) disgorgement of compensation and profits earned thereon as a result of prohibited transactions; (d) reasonable attorney fees and expenses, as provided by ERISA §502(g), 29 U.S.C. §1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and

interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

81.     Under ERISA, each Defendant is jointly and severally liable.

## X. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.      A determination that this action is a proper class action and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      A Declaration that Defendant breached its ERISA fiduciary duties to the Plans and the Class;

C.      A Declaration that Defendant is not entitled to the protection of ERISA §404(c)(1)(B), 29 U.S.C. §1104(c)(1)(B);

D.      A Declaration that Defendant has violated ERISA §406, 29 U.S.C. §1106;

E.      An Order compelling Defendant to make good to the Plans and the Class all losses resulting from the securities lending program and to restore to the Plans and the Class all profits that the participants and beneficiaries would have made if Defendant had fulfilled its fiduciary obligations;

F.      Imposition of a constructive trust on any amounts by which any Defendant were unjustly enriched at the expense of the Plans and the Class as the result of beaches of fiduciary duty;

G.      Restoration of any losses to the Plans and the Class, allocated among the participants' individual accounts within the Plans and the Class, in proportion to the accounts' losses as required by ERISA;

H.      An order requiring Defendant to lift the withdrawal restrictions imposed on

investors in the securities lending program;

I.      An Order awarding costs pursuant to 29 U.S.C. §1132(g);

J.      An Order awarding attorney fees pursuant to the common fund doctrine, 29

U.S.C. §1132(g), and other applicable law;

K.      An Order for equitable restitution and other appropriate equitable and injunctive

relief against Defendant; and

L.      Granting such other and further relief as the Court may deem just and proper.

Plaintiff demands trial on all issues so triable.

Respectfully submitted for the plaintiff,

  /s/ Matthew P. McCue

| | |
|---|---|
| Todd M. Schneider | Matthew P. McCue |
| SCHNEIDER WALLACE COTTRELL | Law Office of Matthew McCue |
| BRAYTON KONECKY LLP | 340 Union Ave. |
| 180 Montgomery Street, Suite 2000 | Framingham, MA 01702 |
| San Francisco, CA 94104 | Tel: (508) 620-1166 |
| Tel: (415) 421-7100 | Fax: (508) 820-3311 |
| Fax: (415) 421-7105 | |
| | Gregory Y. Porter |
| Garrett W. Wotkyns | BAILEY & GLASSER LLP |
| SCHNEIDER WALLACE COTTRELL | 910 17th Street, NW |
| BRAYTON KONECKY LLP | Suite 800 |
| 7702 E. Doubletree Ranch Road, Suite 300 | Washington, DC 20006 |
| Scottsdale, Arizona 85258 | Tel: (202) 463-2101 |
| | Fax: (202) 463-2103 |
| Todd S. Collins | |
| Shanon J. Carson | Brian A. Glasser |
| Ellen T. Noteware | Michael L. Murphy |
| BERGER & MONTAGUE, P.C. | BAILEY & GLASSER LLP |
| 1622 Locust Street | 209 Capitol Street |
| Philadelphia, PA 19103 | Charleston, WV 25301 |
| Tel: (215) 875-3040 | Tel: (304) 345-6555 |
| Fax: (215) 875-4604 | Fax: (304) 342-1110 |

Dated: April 8, 2010