# EXHIBIT 2



SBA FLORIDA
INVESTING FOR FLORIDA'S FUTURE

# INTERNAL AUDIT REPORT
# Report No. 2007-03

# FIXED INCOME-SECURITIES LENDING
# FOLLOW-UP AUDIT

Report # 2007 – 03                                    Fixed Income-Securities Lending Follow-Up Audit

# TABLE OF CONTENTS

| | Page |
|---|---|
| Transmittal Letter | |
| Executive Summary | 1 |
| Background Information | 2 |
| Scope, Objectives, and Methodology | 4 |
| Audit Comments and Recommendations | 5 |
| Appendix A: List of the 20 Recommendations and Their Status | 7 |



**STATE BOARD OF ADMINISTRATION**

1801 Hermitage Boulevard-Suite 100
Tallahassee, Florida 32308
(850) 488-4406

Post Office Box 13300
32317-3300

**CHARLIE CRIST**
GOVERNOR
AS CHAIRMAN

**ALEX SINK**
CHIEF FINANCIAL OFFICER
AS TREASURER

**BILL McCOLLUM**
ATTORNEY GENERAL
AS SECRETARY

**COLEMAN STIPANOVICH**
EXECUTIVE DIRECTOR

June 19, 2007

*Coleman Stipanovich*
*Executive Director*
State Board of Administration
1801 Hermitage Boulevard
Tallahassee, Florida 32308

Dear Coleman:

We have completed the follow-up audit of the recommendations made to the State Board of Administration contained in the OIA Report # 2006-01, *Fixed Income Operational Audit-Securities Lending Program*, issued on July 27, 2006. The results of the follow-up audit are presented in the attached report.

The responses of the Senior Investment Officer-Fixed Income to our draft report issued on June 1, 2007 are included in the body of this report.

We want to extend our appreciation to the Deputy Executive Director and the Fixed Income management and staff for the cooperation and courtesies extended to us during the audit.

Sincerely,

Flerida D. Rivera-Alsing
Chief of Internal Audit
*Office of Internal Audit*

Enclosure-as stated

cc:   Kevin SigRist, Deputy Executive Director
      Rob Smith, Senior Investment Officer-Fixed Income

**State Board of Administration**
**Office of Internal Audit**

# Audit Follow-Up Report

## Fixed Income Operational Audit – Securities Lending
(Original Report, Issued on July 27, 2006)

Report # 2007-03                                                                 June 19, 2007

## EXECUTIVE SUMMARY

As part of our risk-based audit program, we performed an operational audit of the Fixed Income-Securities Lending Program in 2006. Our final report, OIA Report # 2006-01, *Fixed Income Operational Audit-Securities Lending*, containing 20 recommendations was issued on July 27, 2006.

This follow-up audit was conducted to evaluate whether the 20 recommendations made by us and accepted by management were effectively implemented. Our follow-up audit disclosed that Fixed Income (FI) has partially completed the implementation of the recommendations. As of February 28, 2007, the status of the 20 recommendations is as follows:

| Status | Number of Recommendations |
|---|---|
| Implemented | 8 |
| Partially implemented | 1 |
| In process | 6 |
| Ongoing | 2 |
| Can not be implemented until another related recommendation is implemented | 3 |
| Total | 20 |

Appendix A lists the 20 recommendations and our conclusion as to their status.

Our follow-up audit also disclosed the following additional areas where improvements could be made to further strengthen internal controls over securities lending (SL).

Comment # 1 – The SAS 70 reports submitted by KeyBank did not include controls specific to SL.

Comment # 2 – The reconciliation performed by FI appears to be inadequate and is not documented.

## Background Information

SL is a process whereby, for a fee, securities are temporarily transferred by one party (the lender) to another (the borrower). The borrower is obligated to return the securities to the lender, either on demand or at the end of the agreed term. For the period of the loan, the lender is secured by acceptable assets delivered by the borrower to the lender as collateral.

The SL market involves various types of specialist intermediaries which take principal and/or agency roles. As an intermediary between the lender and the borrowers, the agents perform several functions including negotiating the terms of the loans, assessment and monitoring of borrowers' creditworthiness, moving securities, collecting fees, ensuring that adequate collateral is maintained, and providing record keeping. In a principal relationship, the lender gives one institution the exclusive rights to borrow a portfolio of securities. The principal is therefore the sole borrower of these securities. As a route to the SL market, the SBA uses seven SL providers – six agents and one principal. Please see Table 1 below for additional information.

### Table 1 – Securities Lending Providers

| Lending Provider | Type of Specialist Intermediary | Fee Split (SBA/Provider) | Indemnification |
|---|---|---|---|
| BGI | Agent-Investment Manager of Commingled Investment Vehicle | 50/50 | N/A |
| SSgA | Agent-Investment Manager of Commingled Investment Vehicle | 70/30 | N/A |
| Mellon | Agent-Master Custodian | 80/20[1] | Covers loaned securities. |
| Dresdner | Third Party Agent | 80/20 | Covers loaned securities and cash collateral reinvested in repos. |
| Wachovia Global Securities Lending[2] | Third Party Agent | 80/20 | Covers loaned securities and cash collateral reinvested in repos. |
| KeyBank | Third Party Agent | 80/20 | Covers loaned securities. |
| Lehman Brothers[3] | Principal | Standby Commitment Fee | Covers cash collateral reinvested in repos. |

In general, SL revenue can be earned in two ways: (1) from a flat fee that is quoted as a percentage of the securities lent (occurs when collateral is in the form of non-cash investments), and (2) the return earned through the reinvestment of cash collateral received from the borrower. The fee can fluctuate significantly according to supply and demand. The SL revenue is shared between the SBA and the SL provider based on an agreed upon income split.

---

[1] The fee split is 80/20 for the first $10 million, 90/10 for the second $10 million, 95/5 for the next $15 million and 90/10 thereafter.
[2] Effective February 1, 2007, Metropolitan West Securities, LLC is now Wachovia Global Securities Lending.
[3] FI advised us that Lehman stopped borrowing securities from the SBA effective February 28, 2006. The principal agreement, however, is still in effect.

Report # 2007 – 03                                              Fixed Income- Securities Lending Follow-Up Audit

## Background Information

As of February 28, 2007, the participants in the SL program include the FRS Pension Plan, seven non-FRS mandates, and three of the investment pool products of the SBA.

For the month of February 2007, the SL program had about $112.9 billion of average lendable assets and about $23.3 billion average securities on loan. The SL net income for the eight months ended February 28, 2007 was about $34.3 million. Please see Table 2 for additional information.

**Table 2 – SL Data for the Month of February 28, 2007**
**By Lending Provider[4]**

| Provider | Average Lendable Assets | % to Total | Average Securities on Loan | % to Total | SL Net Income (For the Eight Months Ended February 28, 2007) | % to Total |
|---|---|---|---|---|---|---|
| Barclays | $9,861,712,748 | 8.74% | $1,188,317,558 | 5.10% | $3,546,117 | 10.35% |
| Dresdner | $4,785,867,968 | 4.24% | $3,574,094,841 | 15.33% | $4,920,060 | 14.36% |
| KeyBank | $3,633,345,409 | 3.22% | $3,506,287,992 | 15.04% | $2,296,109 | 6.70% |
| Mellon | $88,542,372,236 | 78.46% | $11,791,273,459 | 50.56% | $20,485,297 | 59.79% |
| Wachovia | $5,871,837,542 | 5.20% | $3,235,565,457 | 13.88% | $2,954,338 | 8.62% |
| SSgA | $154,900,445 | 0.14% | $23,788,801 | 0.10% | $59,334 | 0.17% |
| **Total** | **$112,850,036,348** | **100%** | **$23,319,328,108** | **100%** | **$34,261,255** | **100%** |

---

[4] All of the information in Table 2 was based on data obtained from FI.

## Scope, Objectives, and Methodology

### Scope and Objectives

This follow-up audit entailed the review of the status as of February 28, 2007, and the progress of management efforts in implementing the 20 recommendations contained in OIA Report # 2006-01 issued on July 27, 2006. In certain cases, we reviewed subsequent information to provide updated information regarding current processes.

The purpose of this follow-up audit was to evaluate whether the recommendations made and accepted were effectively implemented. Specifically:

- Each recommendation was implemented to address identified risks/conditions raised or that alternatives to the recommendations were used to address the risks/conditions.
- The changes implemented were effective in addressing risks/conditions raised.
- Management's system of internal controls was adequate to ensure effective and efficient use of SBA resources.
- Other issues have developed that need management's attention.

### Methodology

This audit was conducted in accordance with the *International Standards for the Professional Practice of Internal Auditing* published by The Institute of Internal Auditors, Inc., and accordingly included such tests of records and other auditing procedures deemed necessary.

## Audit Comments and Recommendations

**Comment # 1 – The SAS 70 report submitted by KeyBank did not include controls specific to SL.**

As a result of our audit of the SL program in 2006, FI now requires its SL providers to submit their Type II SAS 70 reports on an annual basis. We noted, however, that the SAS 70 report submitted by KeyBank did not include controls specific to SL.

We understand that:
a.   FI communicated this requirement to KeyBank and that KeyBank agreed to include controls specific to SL in their next SAS 70 audits.

b.   The requirement for a Type II SAS 70 report on an annual basis will be reflected on the securities lending agreement (SLA) when the SLAs are updated in July 2007.

**Recommendation:**

1a.   We recommend that FI ensure that the 2007 SAS 70 report of KeyBank includes controls specific to SL.

**Auditee Management Response:**

1a.   FI will verify that the subsequent SAS 70 reports from KeyBank include the proper controls appropriate to the SL program.

**Comment # 2 – The reconciliation performed by FI appears to be inadequate and is not documented.**

FI has started reconciling its SL income data with the SL income data maintained by Accounting. However, the reconciliation appears to be inadequate because it failed to capture the over $2 million difference between the SL income reported by Accounting and the SL income reported by FI. As of February 28, 2007, Accounting reported a net SL income of $36,648,182 and FI reported $34,261,255, or a difference of $2,386,927. We understand that the difference is due to rebates recorded by Accounting but not by FI.

As a general rule, Accounting should be the sole source of financial information within an organization. In rare instances where business units are allowed to maintain "duplicate" financial information, such financial information must be reconciled against the Accounting financial information. This would ensure that the integrity of all financial information within an organization is maintained at all times. Such reconciliation should be documented and reviewed.

**Recommendations:**

2a.   We recommend that FI resolve the difference identified above.

## Audit Comments and Recommendations

2b.  We also recommend that FI decide on whether there is indeed a need to duplicate the recording of financial information. If so, procedures must be implemented to ensure that its reconciliation is adequate and documented.

**Auditee Management Responses:**

2a.  We will request Mellon to send FI the information for the additional rebate to the SBA earmarked for custodial fees and include a line item in our reports.

2b.  FI duplicates the SL data not for financial reasons but as a way to monitor performance. We will begin working on procedures as soon as possible.

Report # 2007 – 03                                                                                              Fixed Income- Securities Lending Follow-Up Audit

## Appendix A:   List of the 20 Recommendations and Their Status

| | Recommendation | Status |
|---|---|---|
| 1a | Benchmark to Measure the Performance of the Securities Lending Program.<br><br>We recommend that FI continue its effort to search for the appropriate benchmark. This effort should be coordinated with the Office of the Investment Policy and Economics. | *Ongoing.*<br><br>FI advised us that recent meetings with Performance Explorer and Astec personnel confirmed FI expectations, i.e., both companies are close in developing adequate security lending benchmarks. FI advised us further that some of our SL providers are accessing one or both systems and using the information to compare themselves versus the competition. Quality of the data and relevant comparison groups are still a concern. FI will continue to monitor the situation and will share their findings with the Office of Investment Policy & Economics. |
| 1b | Benchmark to Measure the Performance of the Securities Lending Program.<br><br>The benchmark must go through the usual approval process, i.e., must be reviewed and approved by the Senior Investment Officer-FI (SIO-FI), Deputy Executive Director, Senior Investment Policy Officer and Economist, and Executive Director. | *Can not be implemented until recommendation 1a is implemented.* |
| 1c | Benchmark to Measure the Performance of the Securities Lending Program.<br><br>Once the benchmark is established, we recommend that FI develop procedures to measure and report the performance of the securities lending program and of the lending providers. | *Can not be implemented until recommendation 1a is implemented.* |
| 2a | SAS 70 Reports of the Lending Providers.<br><br>Moving forward, we recommend that a requirement for an annual Type II SAS 70 report be added as part of the standard language in the SLA. | *In process.*<br>Est. completion date – December 2007.<br><br>SIO-FI advised us that all SL providers have been informed verbally to provide SAS 70 reports on an annual basis. The SLAs will reflect this requirement when they are updated. The estimated completion date is December 2007. |

## Appendix A:   List of the 20 Recommendations and Their Status

| | Recommendation | Status |
|---|---|---|
| 2b | SAS 70 Reports of the Lending Providers.<br><br>FI should require its current lending providers to submit their Type II SAS 70 report on an annual basis.  The SAS 70 reports should include internal controls relevant to the providers' securities lending function.<br><br>Some of the controls that should be reported are as follows:<br>- Loan information is properly entered into the provider systems;<br>- Borrower exposure is properly monitored on a timely basis;<br>- Loans and collateral are marked to market daily to ensure adequacy collateral at all times;<br>- Daily loan activity is timely and accurately processed;<br>- Corporate actions and other distributions are properly recorded for loaned securities;<br>- Cash, holdings, and loan reconciliations are performed completely, accurately and timely.  Reconciling items are researched and resolved;<br>- Cash collateral investments are timely and accurately executed;<br>- Cash collateral is invested in accordance with customer instructions;<br>- Cash collateral investment income is properly recorded and allocated to customer accounts; and<br>- Access to securities lending processing functions and related data is appropriately restricted. | *Implemented.*<br><br>FI obtained SAS 70 reports from the SL providers.  We reviewed the SAS 70 reports obtained by FI and noted the following:<br><br>a. All 6 SL providers submitted their Type II SAS 70 reports.<br><br>b. Except for the SAS 70 reports of SSgA and KeyBank, all SAS 70 reports covered controls relevant to the SL providers' SL program.  (Please see Comment #1.)<br><br>c. The minimum controls mentioned in OIA Report # 2006-01, recommendation 2b, were tested and reported in the SAS 70 report submitted by BGI, Dresdner, Mellon and MetWest. |

## Appendix A: List of the 20 Recommendations and Their Status

| | Recommendation | Status |
|---|---|---|
| 2c | **SAS 70 Reports of the Lending Providers.**<br><br>FI should review the SAS 70 reports received from the lending providers in a timely manner. Items to be given particular attention include the type of SAS 70 obtained by the provider, the opinion of the independent auditors, and nature of exceptions reported by the independent auditors. | *Implemented.*<br><br>FI forwarded the SL providers' SAS 70 reports to Accounting & Financial Operations and Enterprise Risk Management (ERM) for review.<br><br>ERM forwarded us a copy of their memo that contained the results of the review. ERM noted two issues: (1) reports from SSgA and KeyBank do not include controls specific to SL, and (2) the report of Dresdner did not include a test of credit limit or credit worthiness.<br><br>We noted the same issues, however, we believe that the lack of test on credit limit or credit worthiness is a non-issue because the SLAs signed by SL providers include indemnification in case of borrowers default. |
| 2d | **SAS 70 Reports of the Lending Providers.**<br><br>When control deficiencies are noted in the SAS 70 report, FI should evaluate the effect of the deficiencies on the processing of the SBA data and safeguarding of the SBA assets. FI should discuss the deficiencies with the concerned lending provider and inquire as to corrective actions taken. | *Implemented.*<br><br>The issues noted by ERM were discussed by FI with the concerned providers. |

Report # 2007 – 03  Fixed Income- Securities Lending Follow-Up Audit

## Appendix A: List of the 20 Recommendations and Their Status

| | Recommendation | Status |
|---|---|---|
| 3a | **Completion of the Monthly Compliance Procedures.**<br><br>We recommend that FI complete the entire monthly compliance procedures within 10 business days after the monthly reports of the lending providers are received. | *Implemented.*<br><br>We reviewed compliance reports for December 2006 and January 2007 and noted the following:<br><br>a. The December 2006 compliance report for MetWest was completed late (February 13, 2007). FI advised us that the compliance report was completed in a timely manner. However, the preparer forgot to sign it at completion. When the Director of Short-term Investments and Operations noticed it, he asked the staff to sign and date it at the time it was noted.<br><br>b. The January 2007 compliance reports of BGI and SSgA were completed almost two months after month-end. FI advised us that BGI changed their reports in January 2007 and it took BGI extra time to provide FI the reports needed for the compliance. SSgA, on the other hand, submitted their reports on the last week of February 2007 and the compliance report was completed on March 9, 2007. |
| 4a | **Results of Monthly Compliance Review.**<br><br>We recommend that FI perform a "one-off" review of the reports submitted by all lending providers to ensure that the reports submitted are responsive to the compliance requirements of FI. | *In process.*<br>Est. completion date - July 2007. |
| 4b | **Results of Monthly Compliance Review.**<br><br>On a periodic basis, e.g. annually, FI should compare the compliance cover sheet of all lending providers against the corresponding SLAs and reinvestment guidelines. | *In process.*<br>Est. completion date - December 2007.<br><br>SIO-FI advised us that they are currently comparing compliance cover sheets against the SLA's and Reinvestment Guidelines. The estimated completion date is December 2007. |

Report # 2007 – 03                                                                                                         Fixed Income- Securities Lending Follow-Up Audit

## Appendix A: List of the 20 Recommendations and Their Status

| | Recommendation | Status |
|---|---|---|
| 4c | **Results of Monthly Compliance Review.**<br><br>We also recommend that a detailed supervisory review of the results and documents supporting the monthly compliance review be performed by the Manager of Operations and Securities Lending. The compliance review procedures for Dresdner, which is currently done by the Manager of Operations and Securities Lending, should be assigned to another staff in FI Operations. | *Implemented.*<br><br>Using the same compliance reports obtained to validate the implementation of recommendation 3a, we checked who prepared and reviewed the reports and noted the following:<br><br>a. Manager of Operations and Securities Lending reviewed Mellon Bank's December 2006 compliance report. The remaining compliance reports were reviewed by the Director of Short-term Investments and Operations. We consider this to be a non-issue because the review is being performed by the supervisor of the Manager of Operations and Securities Lending.<br><br>b. The Dresdner compliance for December 2006 and January 2007 were completed by Justin Smith, Fixed Income Operations Analyst. |
| 5a | **Written Compliance Procedures.**<br><br>FI develop written procedures for securities lending compliance activities. The written procedures should include, at a minimum, the following items:<br>• A description of how each of the criteria on the compliance cover sheet should be reviewed, e.g. which report should be used to determine whether or not a lending provider is in compliance with a particular criterion;<br>• A description of how each of the criteria on the compliance cover sheet should be reviewed, e.g. which report should be used to determine whether or not a lending provider is in compliance with a particular criterion;<br>• Instructions on (1) how to document compliance results, (2) who to communicate non-compliance issues to; and (3) how to resolve the non-compliance issues;<br>• A record retention schedule consistent with SBA's record retention policy; and<br>• A deadline to complete the compliance review. | *Implemented.*<br><br>Compliance procedures provided to us were prepared in February 2007 and March 2007, the date we asked for the status of the implementation of the recommendations contained in OIA Report # 2006-01.<br><br>All of the written procedures are adequate. MetWest written procedures, however, need enhancement. Because the enhancement is not material, we will communicate the suggested enhancement verbally. (On June 15, 2007, the Chief of Internal Audit and the Manager of Operations and Securities Lending met to discuss the suggested enhancements.) |

Report # 2007 – 03   Fixed Income- Securities Lending Follow-Up Audit

## Appendix A: List of the 20 Recommendations and Their Status

| | | Recommendation | Status |
|---|---|---|---|
| 5b | | **Written Compliance Procedures.** <br><br> The written procedures, once developed, should be reviewed and updated at least annually. This would ensure that changes are reflected in the written procedures, thus, preserving their usefulness. | *Can not be validated at this time.* <br><br> The annual review of the procedures is not due until February 2008. |
| 6a | | **Access Database Maintained by FI.** <br><br> We recommend that FI explore the possibility of developing an electronic interface with its lending providers to receive data without manual intervention. | *Ongoing.* <br><br> FI advised us they have not yet been able to develop an electronic interface between their Access database and the SL providers. Will continue to research. |
| 6b | | **Access Database Maintained by FI.** <br><br> Meantime, we recommend that an independent review of the data input be performed. | *Implemented.* <br><br> SIO-FI advised us that the Manager of Operations and Security Lending is conducting an independent review of the input to verify accuracy. Because the review is not documented, we verbally confirmed the review with the Manager of Operations and Security Lending. |
| 6c | | **Access Database Maintained by FI.** <br><br> To verify the accuracy of the database, we also recommend a periodic reconciliation of specific SL data such as the SL income with an independent source like the SBA Accounting. | *Partially Implemented.* <br><br> FI advised us that the SL income is being reconciled with Accounting. However, the reconciliation is not documented. On June 18, 2007, SIO-FI advised us that the documentation of the reconciliation will begin in June 2007. <br><br> In addition, it appears that the reconciliation is not done correctly because our comparison of the SL income as of February 28, 2007 disclosed a difference of $2,386,927. We understand that these are rebates that are not being recorded by FI. (Please see Comment # 2.) |
| 7a | | **Daily Asset Transfer Notice.** <br><br> We recommend that FI require the preparer of the asset transfer notices and his immediate supervisor to sign off on the notice before they are forwarded to Financial Operations for further processing. | *Implemented.* <br><br> We randomly selected a sample of asset transfer notices and checked the samples for dual signatures. No exceptions were noted. |

12

Report # 2007 – 03                                                                                       Fixed Income- Securities Lending Follow-Up Audit

## Appendix A:  List of the 20 Recommendations and Their Status

| | | Recommendation | Status |
|---|---|---|---|
| 8a | | **Credit/Counterparty Risk.**<br><br>We recommend that FI review the lending providers' financial stability on a periodic basis, e.g. annually. | *In process.*<br>Est. completion date - December 2007.<br><br>FI, in an effort to be consistent with the Derivatives Policy (20-813), now require the SL providers to be rated single A or better. We were advised that the SLAs will reflect this requirement when they are updated. In the meantime, we were advised that FI has communicated this requirement verbally to the SL providers.<br><br>Our review of the ratings of the current SL providers disclosed that all of them met the minimum rating requirement of at least A. |
| 9a | | **Other Provisions in the SLA and the Reinvestment Guidelines.**<br><br>We recommend that FI review the contract provisions that are not being monitored for compliance purposes and ensure that these are reviewed for compliance. | *In process.*<br>Est. completion date - December 2007.<br><br>Due to the borrower indemnity in place with the SL providers, we were advised that FI will revise the SLAs to eliminate the need of an approved borrower list. In the meantime, the SL providers have been instructed to inform FI of an addition to the borrower list prior to any transactions with the new borrower. |
| 9b | | **Other Provisions in the SLA and the Reinvestment Guidelines.**<br><br>We also recommend that FI revise the issuer/counterparty limits section of Mellon's reinvestment guidelines so that the requirements on the limits are clear and straightforward. | *In process.*<br>Est. completion date - December 2007.<br><br>SIO-FI advised us that they are coming to an agreement with Mellon as to the intent of the Issuer/Counterparty limits and the SLA will reflect any new language when it is updated. |