**EXHIBIT 4**

## Feature:Lending Logic

**There are a number of different ways to lend securities. Plan sponsors need to know them all**

**There are a number of different ways to lend securities. Plan sponsors need to know them all**

» Times of Change

» Custodian's Day

» Getting Better

Securities lending has come a long way in a decade. As recently as the late 1980s, only a handful of pension funds, and hardly any investment managers, lent out their securities. Today, the exception is the defined benefit plan with over $250 million in assets that does not lend. Sizeable amounts of money are at stake. The Maryland State Retirement Agency, with a $26.5 billion defined benefit plan of which about 10% is out on loan at any given time with the fund's custodian, State Street, generated $10.42 million in the 12 months ending June 30, 2001, and $13.98 million in the 12 months ending June 30, 2002, according to Victoria Willard, managing director of risk management at the Baltimore-based fund.

There are three ways pension funds can lend securities. By far the most common is through an existing master trust relationship, but plans also can lend through third-party lenders and, in rare cases, directly to the broker/dealer community. Each of these routes is undergoing change, and many plan sponsors are not taking advantage of an increasingly competitive landscape, consultants say. In fact, by common consent, only a handful of investment consultants have invested enough time and energy to understand the dynamics of securities lending. At mainstream firms, by some accounts, that list goes no further than Diane Brown at Frank Russell and Bo Abesamis at Callan Associates, although there is a handful of specialists with historic securities-lending expertise, including Newton, Massachusetts-based Chatham Consultants and Mountainside, New Jersey-based Synkret.

The leading securities-lending banks are the same handful that has come through a Darwinian process of industry attrition to dominate the master trust and global custody business: JP Morgan Investor Services, State Street, Northern Trust, Mellon Trust, and the Bank of New York. "You can't be a world-class custodian without being a world-class securities lender," says Avi Stein, senior vice president and business executive for JP

Morgan's Securities Lending and Investment Products. Third-party lenders include some of the above, which will, when it suits their purposes, act as agent lenders when they are not the custodian, plus banks like Citibank and boutiques like Metropolitan West Securities and Boston Global. A handful of Wall Street firms, led by Morgan Stanley and Goldman Sachs, look to establish direct borrowing relationships with large, sophisticated plans.

top

## Times of Change

The playing field is changing, particularly for sophisticated plan sponsors. Some have opted to handle lending directly, thereby keeping all fee income to themselves. Steven Traum, a managing director at TIAA-CREF, who runs fixed-income securities lending, says the fund accomplishes the lion's share of its lending directly, parceling out securities to a variety of dealers. "We don't have to split the fees we earn or give anything to anyone else." Traum says that TIAA-CREF's custodian runs three fixed-income lending portfolios for the fund, but that direct lending in terms of volume dwarfs that outsourced to custodians. However, Traum says he understands the appeal. "[For many lenders,] it's easier to use a custodian," he says. "The assets are already there (held in custody) and they do everything for you in terms of back-office chores, so it's a lot cleaner."

Amy Crumpler, who oversees securities lending for the Florida State Board of Administration, uses a variety of provider options through which she enhances returns on the FSBA's $76 billion of lendable assets. About 73% of those assets are comprised of domestic and international stocks, with the 27% balance held in fixed-income securities. "We currently use seven providers," Crumpler says. "Our custodian gets 70% of the assets, with a subcustodial relationship as third party getting 5%, another third party also getting 5%, two principal providers at 2%, and two commingled funds at 18%," she explains. Crumpler says the fees garnered by the FSBA range from a 78%/22% to a 60%/40% split, and the FSBA gets a guaranteed return on its two "exclusive" principal programs.

Crumpler sees some disadvantages in the traditional custodial relationship between lender and borrower. "First, custodians typically bundle their custody fees with securities-lending services, which can make it difficult to make stand-alone decisions on securities lending," she says. However, Crumpler also notes that there are drawbacks to setting up third-party arrangements or exclusive relationships where "there are more issues which have to be addressed like operational and contractual issues. These make the process more difficult to set up, but they are not insurmountable," she says. Exclusives, in particular, "can make sense in a well-diversified lending program," she says. Indeed, adds Crumpler, the FSBA has

been approached by Street firms that would like to get their hands on the fund's entire portfolio via an exclusive relationship. That option, says Crumpler, is being looked at now in greater detail.

Other sophisticated funds including IBM, the California State Teachers' Retirement System, and the California Public Employees' Retirement System, for example also favor such "exclusive" deals with Street firms. Wall Street houses with prime brokerage groups are interested in these exclusives because they enable a firm to have guaranteed access to securities that hedge funds are looking to borrow in the highly competitive world of prime brokerage, such exclusives can mean real competitive advantage. Such exclusives generally are paid up front and they can represent very substantial revenues for plan sponsors the aggressive bid by which Credit Suisse First Boston won its first exclusive with CalPERS in 2000 is now part of industry lore. "I wept when I first heard we'd lost the CalPERS bid," remembers an executive at a rival firm, "but I laughed aloud when I heard how much CSFB actually guaranteed CalPERS."

The CalPERS exclusives were conducted through eSecLending, a Boston-based firm that conducts principal auctions; this December, CalPERS will be concluding its third consecutive year of auctions through eSecLending. The platform has struggled to convince other US plans to utilize it, but, says eSecLending chief executive Susan Peters, "We are seeing other public funds coming to us and saying that they are willing to stick their toes in the water. It's just a matter of time."

"Almost all plan sponsors with portfolios greater than $1 billion or with substantial small-cap or international holdings should consider exclusives as part of a portfolio distribution strategy," says Kevin Mirabile, a New York-based managing director at Barclays Capital. "Plan sponsors need to move away from a single solution to securities lending and manage distribution and returns like any other class, using a combination of strategies to maximize return and minimize risk."

top

## Custodian's Day

Perhaps, but the present still belongs to the custodians, their grip solidified by the intertwining of fees, by the perception that lending through custodians is less risky, and by the ease of working with a single central relationship. The risk issue, while nebulous, remains a factor in the handful of instances where custody banks took what turned out to be excessive risk in reinvesting collateral (Mellon and Harris Trust in 1994 being the most egregious examples),

plan sponsors were made whole. "Whenever I get approached by a Wall Street firm on exclusives, or by any agent, I try to work out how much more securities-lending income I would generate and whether there is any more risk involved," says a plan sponsor at a large Midwest-based corporate plan. "Then, I go to my custodian, Northern Trust, and have a conversation about what I've been offered. Generally, we find a way to come to a new arrangement."

"The fact of it is, third-party securities lending remains limited," says Ralph Vitale, who heads up the securities finance business at State Street, the largest agent lender. "Pricing interdependency between custody and securities lending is still there and is not going away." Adds JP Morgan's Stein: "If you're a pension fund and your custodian is a decent lender, then don't consider going outside that."

It goes without saying that this is not a universally held conviction. "Anyone over $1 billion in assets still at 60/40 should be talking to agent lenders," says Brendan McCarthy, vice president at Citibank in New York, "and any large plans ($10 billion and better) not at 80/20 should likewise be talking to lenders. Whether the custodians like it or not, third-party lending is growing by leaps and bounds." Contends Mark Faulkner, managing partner at the London-based consultancy Securities Finance International, third-party agent lending specialists represent one of the faster growing sectors of securities lending and, in the US in particular, "the demand for agent intermediaries often stems from frustration over custodial performance."

top

## Getting Better

In general, the splits that plan sponsors get   that is, how much of the money generated by lending out securities finds its way back to the plan   have improved. A decade ago, 50/50 splits were the norm; now, large pension funds are extracting 80% of the take. However, an end to this trend is in sight, say some lenders. "Our average fee split has not moved in the last two years," says State Street's Vitale. A survey by PLANSPONSOR.com in August 2002 found that very few plan sponsors had, in fact, moved away from their custodians as their exclusive securities lending agent   splits ranged as low as 60/40 but the norm was somewhere between 70% to 80%.

"Most of our clients have used and continue to use their custody banks for securities lending," says Dianne Brown, manager of Fiduciary Services at Tacoma, Washington-based Frank Russell Co, "but, in the last three to four years, that has begun to change at the

margin, particularly with regard to larger funds that have an internal investment staff. Occasionally, the custody bank brings it on itself when it looks to increase its fees, or charge a transaction fee on loans. If your fund has a large base of unique lendable assets, you might want to look at third-party lenders. Mostly, however, there's a level of comfort that comes with a securities lending relationship with your master trust bank, and that tends to be important."

top

Charles Ruffel

editors@plansponsor.com

# SPONSORED RESOURCE CENTER
## Searching for Retirement Advice
Click here for our video interview with Jon Prescott, Chief Marketing Officer, CPI Qualified Plan Consultants.

# SPONSORED RESOURCE CENTER
## Retirement Insights
At PLAN DESIGNS 2009, PLANSPONSOR met with Steve Smith, VP, Sales & Corporate Plans Market Leader, Diversified Investment Advisors

# SPONSORED RESOURCE CENTER
## To advertise here...
...please call Hayward Henderson at 203-979-6195 (m), or click here to send hhenderson@assetinternational.com an email inquiry.

Copyright ©1989-2010 . Asset International, Inc. . All Rights Reserved. No Reproduction without Prior Authorization