**EXHIBIT C TO THE MARCH 19, 2012 DECLARATION OF
BRAD E. KONSTANDT IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

1

1       IN THE UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3

4       _____

5    GLASS DIMENSIONS, INC., ON      )
     BEHALF OF THE GLASS             )Civil Action No.
6    DIMENSIONS, INC. PROFIT         )1:10-CV-10588(JLT)
     SHARE PLAN AND TRUST, AND       )
7    ALL OTHERS SIMILARLY            )
     SITUATED,                       )
8            Plaintiffs,             )
                                     )
9        vs.                         )
                                     )
10   STATE STREET CORPORATION,       )
     STATE STREET BANK & TRUST       )
11   CO., AND STATE STREET GLOBAL    )
     ADVISORS,                       )
12           Defendants.             )
                                     )
13   _____)

14

15           VIDEOTAPED DEPOSITION of DARRELL

16   R. PERKINS, called as a witness by and on behalf of

17   the Defendants, pursuant to the applicable

18   provisions of the Federal Rules of Civil Procedure,

19   before P. Jodi Ohnemus, RPR, RMR, CRR, CA-CSR

20   #13192, NH-CSR #91, MA-CSR #12393, and Notary

21   Public, within and for the Commonwealth of

22   Massachusetts, at the offices of WilmerHale, LLP,

23   60 State Street, Boston, Massachusetts, on

24   Wednesday, 15 June, 2011, commencing at 10:07 a.m.

**2**

1  APPEARANCES:
2
3
4          BAILEY & GLASSER LLP
5          BY:  Gregory Y. Porter, Esq.
6            -and-
7          Leona Z. Goldshaw, Esq.
8          910 17th Street NW
9          Suite 800
10         Washington, DC  20006
11         202 463-2111
12         Gporter@baileyglasser.com
13         Lgoldshaw@baileyglasser.com
14         For the Plaintiffs
15
16
17
18
19
20
21
22
23
24

**4**

1              I N D E X
2
3  TESTIMONY OF:                    PAGE
4
5  DARRELL R. PERKINS
6
7  (By Mr. Rudman)              6, 145
8  (By Mr. Porter)              141
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**3**

1  APPEARANCES:  (CONT'D)
2
3          WILMER CUTLER PICKERING HALE
4          AND DORR LLP
5          BY:  Jeffrey B. Rudman, Esq.
6          60 State Street
7          Boston, MA  02109
8          617 526-6912
9          Jeffrey.rudman@wilmerhale.com
10           -and-
11         Brad Konstandt, Esq.
12         399 Park Avenue
13         New York, NY  10022
14         212 230-8888
15         Brad.konstandt@wilmerhale.com
16           -and-
17         Jeffrey Chang, Esq.
18         1875 Pennsylvania Avenue NW
19         Washington, DC  20009
20         202 663-6307
21         Jeffrey.chang@wilmerhale.com
22         For the Defendants
23  ALSO PRESENT:
24         George Dobrentey, Videographer

**5**

1              E X H I B I T S
2
3  EXHIBIT      DESCRIPTION          PAGE
4
5  Perkins 1    email, 5/26/011        11
6  Perkins 2    5994480-486            20
7  Perkins 3    SS-GD 0014349-351        45
8  Perkins 4    SS-GD 14302            60
9  Perkins 5    5994480-486            64
10 Perkins 6    5999842-844            64
11 Perkins 7    4632729-732            85
12 Perkins 8    First Amended Class Action    90
13              Complaint
14 Perkins 9    SS-GD 0000560-563       121
15 Perkins 10   SS-GD 0578-581         129
16 Perkins 11   SS-GD 551-554          131
17
18
19
20
21
22
23
24

2 (Pages 2 to 5)

**6**

1      VIDEO OPERATOR:  Good morning.  My name is
2  George Dobrentey of Veritext, New York.  Today's
3  date is June 15th, 2011, and the time is 10:07 a.m.
4  This deposition is being held at WilmerHale, in
5  Boston, Massachusetts.
6      The case caption is Glass Dimensions,
7  Incorporated versus State Street Corporation, in
8  the US District Court for the District of
9  Massachusetts, Case No. 1:10-cv-10588.  The name of
10  the witness is Darrell Perkins.
11      Will counsel please introduce themselves;
12  and will the court reporter swear in the witness.
13      MR. PORTER:  Gregory Porter and Leona
14  Goldshaw for the Plaintiffs.
15      MR. RUDMAN:  Jeff Rudman, Jeff Chang, Brad
16  Konstandt, for the Defendants.
17      DARRELL R. PERKINS, having
18      satisfactorily been identified by
19      the production of a driver's license,
20      and being first duly sworn by the Notary
21      Public, was examined and testified as
22      follows to interrogatories
23  BY MR. RUDMAN:
24  Q.   For the record, sir, your full name.

**7**

1  A.   Darrell Richard Perkins.
2  Q.   Residential address?
3  A.   35 Conomo Point Road, Essex, Mass.  01929.
4  Q.   Do you work for a company?
5  A.   Yes.
6  Q.   Named?
7  A.   Glass Dimensions.
8  Q.   And what is your title with the company?
9  A.   CFO, COO.
10  Q.   And where is Glass Dimensions located,
11  please?
12  A.   197 Western Avenue, Essex, Mass.
13  Q.   What is the business of Glass Dimensions?
14  A.   We make handblown glass giftware.
15  Q.   What's your father's full name, please?
16  A.   David Robert Perkins.
17  Q.   His age?
18  A.   66, 67.
19  Q.   And his highest level of education?
20  A.   High school.
21  Q.   What is your mom's full name, please.
22  A.   Maureen Perkins.
23  Q.   And what is -- forgive me for being
24  ungallant -- but what is her age, please?

**8**

1  A.   64, I believe.
2  Q.   And what is her level -- highest level of
3  education?
4  A.   High school -- maybe some -- a couple of
5  courses after that, but I'm not sure.
6  Q.   So both your parents are high school
7  grads?
8  A.   Yes.
9  Q.   And what position do they occupy with
10  Glass Dimensions?
11  A.   My father's the president.  My mom's the
12  treasurer.
13  Q.   And did your parents essentially found the
14  company?
15  A.   Yes.
16  Q.   How many employees does the company have?
17  A.   Right now?
18  Q.   At the moment, yeah.
19  A.   Paid?  Zero.
20  Q.   Paid, zero.
21  A.   (Witness nods.)
22  Q.   Were there more participants or more
23  employees than that at one point?
24  A.   Yes, 50 at the highest.

**9**

1  Q.   When was that, please.
2  A.   '94, '95, I'm guessing.
3  Q.   What was the employee population, let's
4  say, in 1993?
5  A.   I came on in '97, so I would guess it was
6  around 50 in '93.  But in '97 it was probably down
7  to 20.
8  Q.   And let's say 2 -- '97, okay.  Well, how
9  about 2003?
10  A.   2003?  Down to five maybe, six.
11  Q.   And you went to Brown College, right?
12  A.   Uh-huh.
13  Q.   And you went to Duke for business school?
14  A.   Correct.
15  Q.   Does Glass Dimensions currently have a
16  pension plan?
17  A.   No.
18  Q.   Did it?
19  A.   Yes.
20  Q.   When did the pension plan go away?
21  A.   Within the last few months.
22  Q.   Within the last few months.
23      Where are the proceeds of that pension
24  plan now?

3  (Pages 6 to 9)

**118**

1 Porter?
2     A.  To supervise Mr. Porter?
3     Q.  Yes.
4     A.  I'm not understanding your question.
5     Q.  All right.  Do you understand that Mr.
6 Porter is really the only lawyer who's working for
7 you in this matter?
8     A.  I believe there are other attorneys
9 working on the case.
10    Q.  Can you give me their names?
11    A.  No.
12    Q.  You -- you can't or you won't?
13    A.  I can't.
14        MR. PORTER:  He doesn't --
15    A.  I don't know the specific names of the
16 other attorneys that are working on the case, no.
17    Q.  Do you know what their fee arrangement is
18 with you --
19    A.  I don't believe --
20    Q.  -- with Glass Dimensions?
21    A.  -- believe that we have an arrangement
22 with them.
23    Q.  I see.  Do you know if you have an
24 arrangement with Mr. Porter that is binding on

**119**

1 them?
2     A.  I do not know.
3     Q.  Do you know what responsibility you have
4 to supervise the other lawyers assisting Mr. Porter
5 on this case?
6     A.  To supervise?
7     Q.  Yes, to oversee.
8     A.  I -- I don't -- I don't understand what
9 you mean by that.
10    Q.  So as far as you're concerned, Glass
11 Dimensions' obligation in this matter is to tell
12 the truth.
13    A.  Yes.
14    Q.  Does that include you?
15    A.  Yes.
16    Q.  But you didn't even want to be deposed
17 today; did you?
18    A.  Oh, I didn't see the purpose, 'cause I
19 wasn't involved for such a long time with the plan;
20 and only once we started did I have any reluctance
21 -- recollection of any role -- as you call it -- in
22 the plan was when we needed to get -- when we
23 wanted to take our money out and we couldn't.
24    Q.  Right.  But you know you had a role before

**120**

1 that; don't you?
2     A.  One email correspondence -- yeah.  I
3 wouldn't say that was a role.
4     Q.  Or more.
5     A.  And maybe gone to a meeting.
6     Q.  Oh, you did go to a meeting with State
7 Street?
8     A.  I -- I did.
9     Q.  Pardon?
10    A.  Yes.
11    Q.  When was that?
12    A.  I don't remember.  It was --
13    Q.  What year?
14    A.  I don't remember.
15    Q.  2005?
16    A.  Probably later.
17    Q.  2006?
18    A.  I have to guess later, but I'm not sure.
19    Q.  With whom did you meet at State Street?
20    A.  As I said, I don't remember.  I stated
21 that originally when I talked about it.
22    Q.  And do -- you don't have any memory --
23 were your parents with you, or did you meet alone?
24    A.  Definitely -- no, my parents were there.

**121**

1     Q.  Your parents were there.  So all three of
2 you had a chance to ask any questions you wanted to
3 ask of State Street.
4     A.  As you stated before, yes.
5        MR. RUDMAN:  I'm going to mark as Exhibit
6 9 a plan declaration -- a fund declaration -- for
7 the Daily International Alpha Securities Lending
8 Fund.
9        Madam reporter, if you could kindly mark
10 that as Exhibit 9.
11        Mr. Porter, that's for you.
12       MR. RUDMAN:  Madam reporter, if you could
13 kindly put Exhibit 9 in front of the witness, I'd
14 be grateful.
15       (Perkins 9, SS-GD 0000560-563.)
16    Q.  Now, sir, it is your testimony that the
17 Daily International Alpha Securities Lending Fund
18 was a fund with which you were -- meaning the
19 pension plan was invested.
20    A.  I believe so, yeah.
21    Q.  All right.  Good.
22       Could you turn, please, to the second page
23 of Exhibit 9.
24       Do you see in the middle of the page the

31  (Pages 118 to 121)

**122**

1  following words:  "Fees and Expenses"?
2      Are you with me?
3  A.  Uh-huh.
4  Q.  Yes or no?
5  A.  Yes.  Sorry.
6  Q.  "The fund will be charged custody fees as
7  set forth on the attached schedule.  The fund will
8  also be charged an annual audit fee and such other
9  fees as are permitted by the declaration of trust."
10     Did I read that right?
11 A.  I believe so.
12 Q.  Let me go to the next paragraph:  "No less
13 than 50 percent of the securities lending revenue
14 will accrue to the benefit of the participants of
15 the fund."
16     Did I read that right?
17 A.  Yes.
18 Q.  "As compensation for these securities
19 lending services conducted on behalf of the fund,
20 the trustee will generally receive a fee of no more
21 than 50 percent of the income generated by such
22 securities lending activities."
23     Did I read that right?
24 A.  Yes.

**123**

1  Q.  Do you know who the trustee is?
2  A.  My understanding is State Street.
3  Q.  Okay.  Your understanding is State Street.
4      And if you go back to the first paragraph
5  of the document and just look at it quickly, I
6  think you will see that it says State Street Bank &
7  Trust Company is the trustee.
8  A.  Yes.
9  Q.  Okay.  So you're not in the least confused
10 who the trustee was or is, right?
11 A.  No, sir.
12 Q.  And you are not in the least confused as
13 to how much money the trustee gets for engaging in
14 securities lending on behalf of the fund.
15     MR. PORTER:  Now?
16     MR. RUDMAN:  Now.
17 A.  Now?  No.
18 Q.  All right.  Would you agree with me it is
19 perfectly clear from this declaration -- fund
20 declaration.
21     MR. PORTER:  That being Exhibit No. 9.
22     MR. RUDMAN:  Exhibit No. 9?
23 A.  Yeah.  If one read that, yes.
24 Q.  Okay.  So you would agree that, if one

**124**

1  read that, one would know precisely how State
2  Street was being compensated.
3      Yes?
4  A.  It's pretty clear.
5  Q.  Now, would you agree with me that you
6  could have asked to see this document at any time
7  you liked?
8  A.  How would I know how to ask for a document
9  that I didn't know existed?
10 Q.  Well, you knew you were investing with an
11 investment firm, right?
12 A.  (Witness nods.)
13 Q.  Correct, State Street?
14 A.  Yes.
15 Q.  You knew there had to be some paperwork
16 for the fund; did you not?
17 A.  Yes.
18 Q.  I mean, you were a graduate of the Duke
19 business school, correct?
20 A.  Yes.
21 Q.  It's called Fuqua?
22 A.  Correct.
23 Q.  F-u-q-u-a?
24 A.  Correct.

**125**

1  Q.  And do you have an MBA?
2  A.  Yes.
3  Q.  So -- and you went to -- I'm sorry.  I
4  forgot which college.
5  A.  Brown University.
6  Q.  You went to Brown.
7      What did you major in at Brown?
8  A.  International relations.
9  Q.  And what's your MBA in, if it's -- if it's
10 specific?
11 A.  It's not a specific MBA, but I
12 concentrated on finance courses.
13 Q.  Okay.  So you concentrated in finance at
14 Fuqua, correct?
15 A.  Yes.
16 Q.  And you do have degrees both from Brown
17 and from Fuqua, right?
18 A.  Correct.
19 Q.  So you're not an unsophisticated guy; are
20 you?
21     MR. PORTER:  Objection.  Argumentative.
22 Q.  You knew if you invested with a mutual
23 fund or a securities lending fund there had to be
24 documents describing the operations of the fund,

**32  (Pages 122 to 125)**

**126**

1  correct?
2      A.  Bernie Madoff didn't have any.
3      Q.  I see.  So your belief is that Mr. Madoff
4  ran his business exactly as State Street ran his?
5      A.  I did not say that.
6      Q.  All right.  Would you agree with me, sir,
7  that Mr. Madoff wouldn't meet with people and
8  wouldn't answer questions?
9      A.  I have no idea.
10      Q.  All right.  So you don't know how State
11  Street is or is not like Mr. Madoff.
12      A.  None whatsoever.
13      Q.  And that's just kind of a slur that you'd
14  probably like to retract.
15          MR. PORTER:  Objection.
16      A.  I have no reason to retract anything.
17      Q.  I see.  So you think State Street is
18  equivalent to Bernie Madoff?
19          MR. PORTER:  Objection.  Asked and
20  answered.
21      A.  I never said anything like that.
22      Q.  Okay.  Fine.
23          Would you agree with me, sir, that you
24  knew that State Street had to have documents that

**127**

1  governed the investment products they were offering
2  the public.
3      A.  I would assume they would have, yes.
4      Q.  Yes.  And you'd have assumed that in 1997,
5  right?
6      A.  Absolutely.
7      Q.  All right.  And you never asked to see the
8  documents governing the products in which you or
9  the pension plan or Glass Dimensions itself were
10  invested, right?
11      A.  No, sir.
12      Q.  No, sir.  You knew how to send emails
13  asking questions, right?
14      A.  Quite capable.
15      Q.  And you knew how to go to meetings at
16  State Street, right?
17      A.  I could find it, yes.
18      Q.  You knew how to use the telephone.
19      A.  I'm quite capable.
20      Q.  Yeah.  You knew about things like REITs,
21  right?
22      A.  Uh-huh.
23      Q.  And you knew that there were --
24      A.  Yes.

**128**

1      Q.  -- documents which governed the investment
2  products you were invested in, correct?
3      A.  I didn't know they existed, but I could
4  assume that they existed.
5      Q.  Okay.
6      A.  And had I asked for them, I assume it
7  would have been given to me.
8      Q.  If you asked for them, you'd have got 'em,
9  right?
10          Correct?
11      A.  Correct.
12      Q.  So -- and finally, you would agree with me
13  that if you had read Exhibit 9 -- which you say you
14  didn't -- you'd have known exactly how much you
15  were being charged.
16      A.  Yes.
17          MR. RUDMAN:  Let's go to Exhibit 10.
18          MR. PORTER:  How much longer on the tape?
19  VIDEO OPERATOR:  15 minutes.
20          MR. RUDMAN:  We may be done.
21          MR. PORTER:  Oh, really?  Okay.
22          MR. RUDMAN:  I'm not promising you, but
23  I'm trying.
24          MR. PORTER:  Well, you can't tantalize me

**129**

1  like that, Jeff.
2          MR. RUDMAN:  If that constitutes
3  tantalization, you have an Anthony Weiner problem.
4          MR. PORTER:  All right.  Let's go with
5  titillation.  How about that?
6          MR. RUDMAN:  Let's mark as Exhibit 10 the
7  Amended Fund Declaration for the Active US Small
8  Cap Securities Lending Fund.
9      Q.  Here's my simple question, sir.
10          (Perkins 10, SS-GD 0578-581.)
11      Q.  Here's my simple question to you, sir:
12  Would you agree with me that the Active US Small
13  Cap Securities Lending Fund was one of the funds
14  with which the Glass Dimensions pension plan -- in
15  which the Glass Dimensions pension plan was
16  invested?
17      A.  I believe so, yes.
18      Q.  All right.  Would you please turn to the
19  second page.
20          You will see it says, "Permitted class of
21  units, fees, and expenses," right?
22      A.  Yes.
23      Q.  Would you turn over to the third page.
24  And at the top of the page, do you see the

33  (Pages 126 to 129)

**130**

1    following words: "No less than 50 percent of the
2    securities lending revenue will accrue to the
3    benefit of the participants of the fund."
4        Did I read that right?
5    A.   Yes.
6    Q.   Next sentence: "As compensation for these
7    security lending services conducted on behalf of
8    the fund, the trustee will generally receive a fee
9    of no more than 50 percent of the income generated
10   by such security lending activities."
11       Do you see that?
12   A.   Yes.
13   Q.   Would you agree with me, sir, that if you
14   had seen Exhibit 10 at the time, you would have
15   known exactly how much the Small Cap Securities
16   Lending Fund was making by virtue of the services
17   it was offering?
18       MR. PORTER:  Objection.
19   A.   Generally, yeah.  I would.  This just
20   says, "generally receive," but yeah, roughly.
21   Q.   You would have known the trustee --
22   meaning State Street -- was getting roughly 50
23   percent of the profits, correct?
24   A.   That would be my assumption, yes.

**131**

1    Q.   Perfectly clear, right?
2    A.   Well, it's not exactly clear, 'cause it
3    says, "the trustee will generally receive."  I
4    don't know what that means.
5    Q.   All right.  Approximately 50 percent.
6    A.   Approximately, yes.
7    Q.   Okay.
8        MR. RUDMAN:  Next.  The last fund
9    declaration.  We will mark as Exhibit 11 the fund
10   declaration for the Passive Bond Market Securities
11   Lending Fund.  Madam reporter.
12   Q.   Mr. witness, I'll put this right in front
13   of you.  All right.
14       MR. PORTER:  She has to stamp it first.
15       (Perkins 11, SS-GD 551-554.)
16   Q.   Okay.  Go to Page 3, which is SS-GD
17   0000553.  And do you see that the following
18   language appears:  "No less than 50 percent of the
19   securities lending revenue will accrue to the
20   benefit of the participants of the fund."
21       Excuse me.  Do you see that, sir?
22   A.   Yes.
23   Q.   Let me read the next sentence to you:  "As
24   compensation for these securities lending services

**132**

1    conducted on behalf of the fund, the trustee will
2    generally receive a fee or no more than 50 percent
3    of the income generated by such securities lending
4    activities."
5        Do you see that?
6    A.   Yes.
7    Q.   Would you agree with me that if you had
8    read Exhibit 11 at the time, you would have known
9    how much money the trustee was generally making?
10   A.   Roughly, yes.
11   Q.   You would have known what State Street was
12   charging.
13   A.   Roughly, yes.
14   Q.   Yes.  Okay.  No big mystery, right?
15       MR. PORTER:  Objection.  Argumentative.
16   Q.   Right?
17   A.   Do I think it's a mystery?
18   Q.   Well, now that you've read that --
19   A.   Now that I've read it, it seems pretty
20   straightforward.
21   Q.   Good.  Thank you.  All right.
22       Now, did you provide your counsel with,
23   quote, "all documents, other than electronic
24   documents, that Glass Dimensions has in its

**133**

1    possession, custody, or control pertaining to the
2    Glass Dimensions, Inc. Profit Sharing Plan and
3    Trust"?
4    A.   All documents other than electronic
5    documents?
6    Q.   Uh-huh.  Yes.
7    A.   What do you mean by "electronic
8    documents"?
9    Q.   Electronic documents are things like
10   email.
11   A.   Oh, I think we gave him everything.
12   Q.   Well, what role did you have in searching
13   for documents?
14   A.   Not much.
15   Q.   Well, did you search your own house?
16   A.   No.  I don't have any of the documents.
17   Q.   Did you search your office?
18   A.   I don't have any documents there either.
19   Q.   Well, what did you personally do to search
20   for documents?
21   A.   I didn't do much.
22   Q.   Okay.  Can you tell me, sir, how many
23   meetings at State Street have you attended over the
24   years?

34  (Pages 130 to 133)